THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

* * * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | NO. 4:23-CR-0413 |
| | * | NO. 4:23-MJ-1602 |
| VS. | * | Houston, Texas |
| | * | 1:57 p.m. - 2:48 p.m. |
| ABIGAIL JO SHRY | * | August 14, 2023 |

* * * * *

**PROBABLE CAUSE/DETENTION HEARING**

BEFORE THE HONORABLE SAM SHELDON
UNITED STATES MAGISTRATE JUDGE

* * * * *

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
GLRtransribers@aol.com
409-330-1610

1    **APPEARANCES:**

2    For the United States:

3        MR. RICHARD D. HANES
         **U.S. Attorney's Office**
4        1000 Louisiana
         Suite 2300
5        Houston, TX 77002

6    For the Defendant:

7        MR. AMIR A. AMED
         **Office of Federal Public Defender**
8        440 Louisiana
         Suite 1350
9        Houston, TX 77002

10   Court Clerk:

11       SHANNON JONES

12   Electronic Recorder:

13       B. ROMERO

14

15

16

17

18

19

20

21

22

23

24

25

**WITNESS INDEX**

Government's Evidence:

    Special Agent Joshua Henry

       Direct Examination by Mr. Hanes....... 6

       Cross-Examination by Mr. Ahmed........ 7

       Redirect Examination by Mr. Hanes..... 14

Defendant's Evidence:

    Mark Shry

       Direct Examination by Mr. Ahmed....... 15

       Cross-Examination by Mr. Hanes........ 19

       Redirect Examination by Mr. Ahmed..... 23

Proffer by Mr. Ahmed.......................... 25

Argument by counsel and Court's ruling......... 26

1   **P R O C E E D I N G S**

2   **1:57 P.M. - AUGUST 14, 2023**

3          THE COURT:  Ms. Shry, you are here with your

4   attorney, Amr Ahmed, and Richard Hanes is here on

5   behalf of the United States.

6              We're here for Ms. Shry's Probable Cause

7   Hearing and also Detention Hearing.  The Government has

8   given me a two-page proffer.

9              Mr. Ahmed, any objection to admitting into

10  evidence as Government's Exhibit 1 the proffer?

11         MR. AHMED:  No, Your Honor.

12         THE COURT:  And so, Shannon, that proffer will

13  not be under seal.  The 2 will be under seal, but not 1.

14             And any objection, Mr. Ahmed, in admitting

15  the Pretrial Report as Government's 2?

16         MR. AHMED:  I'm sorry, Judge, which document

17  is under seal?

18         THE COURT:  The Pretrial Report will be under

19  seal.

20         MR. AHMED:  I just wanted to note that the

21  Complaint excluded the name of the Judge.

22         THE COURT:  Not any more.

23         MR. AHMED:  Okay.

24         THE COURT:  So the Complaint now is -- the

25  Affidavit is -- so the original -- the Complaint is

1 unsealed.

2        MR. AHMED:  I got it.

3        THE COURT:  The Affidavit.

4        MR. AHMED:  Okay.  Yes, no objection.

5        THE COURT:  Okay.  So the proffer will be

6 Government's Exhibit 1.  That won't be sealed.  The

7 Pretrial Report is Government's Exhibit 2, and that

8 will be sealed.  That won't be a part of the public

9 record.  It's No. 2.

10        You got those, Shannon?

11        COURT CLERK:  Yes.

12        THE COURT:  Okay.

13        And Mr. Hanes, do we have the agent here?

14        MR. HANES:  We do, Judge.

15        THE COURT:  Okay, let's put him on.

16        MR. HANES:  Federal Protective Services

17 Special Agent Josh Henry.

18        THE COURT:  Okay.  Good afternoon, sir.

19        COURT CLERK:  Do you solemnly swear that the

20 testimony you will give before the Court today will be

21 the truth, the whole truth, and nothing but the truth,

22 so help you God?

23        THE WITNESS:  Yes.

24        THE COURT:  Just pull the microphone in front

25 of you so we can hear.

1    THE WITNESS:  Okay.

2    THE COURT:  Okay.  Go ahead, Mr. Hanes.  You

3 will just have him introduce himself and then just mark

4 it for the record and then turn it over for Cross.

5    MR. HANES:  Very good.

6   **SPECIAL AGENT JOSHUA HENRY, Called by the Government**

7                   **DIRECT EXAMINATION**

8 **BY MR. HANES:**

9 Q.  If you would, please, sir, would you state your

10 name and spell your last name for the court reporter.

11 A.  All right, my name is Joshua Henry, last name

12 H-e-n-r-y.

13 Q.  And where are you employed, sir?

14 A.  Federal Protective Service Homeland Security.

15 Q.  Okay.  And have you had an opportunity to review

16 before right now this document that I'm holding

17 entitled Proffer?

18 A.  Yes.

19 Q.  And is it true and accurate to the best of your

20 knowledge and belief?

21 A.  Yes.

22    THE COURT:  Oh, let me just ask you, what's

23 your position?

24    THE WITNESS:  I'm a Special Agent.

25    THE COURT:  And how long have you been a

1  Special Agent?

2          THE WITNESS:  14 years.

3          THE COURT:  Okay.  Go ahead, Mr. Ahmed.

4                    **CROSS-EXAMINATION**

5  **BY MR. AHMED:**

6  Q.  Agent Henry, were you part of the arrest of

7  Ms. Shry?

8  A.  Yes.

9  Q.  Was she interviewed prior to her arrest?

10 A.  Yes.

11 Q.  Were you part of that interview?

12 A.  Yes.

13 Q.  Was it recorded?

14 A.  Yes.

15 Q.  Can you tell the Court about the day that you went

16 over to interview her?

17 A.  Well, when we got there, she -- she was very kind

18 of -- she wouldn't open the door to talk to us.  We had

19 to kind of convince her, "Hey, we just want to have a

20 conversation with you.  We're not here to arrest you."

21         When she did come out, she began a rant,

22 explaining her hate for the Government and

23 Congresswoman, Democrats.  After we let her talk and go

24 on about her rant, we asked a specific question about

25 her, did she want to cause harm to Sheila Jackson Lee.

```
1  She said if Sheila Jackson Lee comes to Alvin, Texas,
2  then we need to worry.  If she does not come to Alvin,
3  Texas, then we don't need to worry.
4           Through the interview, she was very dismissive.
5  She didn't seem to care much.  An attitude most of the
6  time.  Yeah.
7  Q.   Was this a mobile home?
8  A.   Yeah.
9  Q.   Was she alone?
10 A.   No.  Her boyfriend came towards the middle end of
11 the interview.
12 Q.   Any problems with him?
13 A.   No.
14 Q.   What time of day was it?
15 A.   Early afternoon, I would guess, yeah.
16 Q.   Any signs of intoxication on her part?
17 A.   Not at the time, no.
18 Q.   Did she admit to making the phone call?
19 A.   Yes.
20 Q.   The phone call was to a judge?
21 A.   Right.
22 Q.   How many phone calls were there?
23 A.   One phone call.
24 Q.   Was there a phone call to Congresswoman?
25 A.   No, but she mentioned the Congresswoman in the
```

1  voicemail to the judge.

2  Q.   Okay.  Did she apologize for making the phone call?

3  A.   In a sarcastic way.

4  Q.   What do you mean?

5  A.   Kinda like, "I'm sorry."  Kinda like, "I'm sorry,"

6  kinda like that.  Kinda like a -- almost like an

7  attitude.

8  Q.   Did you ask her about any kind of travel plans?

9  A.   She said she wouldn't travel.  She does not want to

10 go to D.C.  She really doesn't want to leave Alvin for

11 the most part.

12 Q.   And when she was referring to the Congresswoman, is

13 that Congresswoman Lee?

14 A.   Sheila Jackson Lee, yes.

15 Q.   And she's a Texas Congresswoman?

16 A.   Yes.

17 Q.   And she was saying that if the Congresswoman

18 comes -- was it to her house or to Alvin?

19 A.   Alvin.

20 Q.   And was she arrested a few days later?

21 A.   Yes.

22 Q.   And what happened when she was arrested?

23 A.   When we arrived, the boyfriend told us the door --

24 "Please don't break the door, the door is open, she's

25 on the sofa probably sleeping."

1        So we rushed in and just grabbed her right

2   there.  She didn't say much, but called us a bunch of

3   idiots.  Other than that, that was all.  That was about

4   it.

5   Q.  I'm sorry, I didn't understand the last thing.

6   A.  She just called us a bunch of idiots and that was

7   about it.  She didn't say much when we arrested her.

8   Q.  Did she have a cell phone with her?

9   A.  No, she left everything inside the house, inside

10  the home.

11  Q.  Was her cell phone taken as part of this

12  investigation?

13  A.  Not that I'm aware of.

14  Q.  So the entire case is based on the one phone call

15  at 7:51 on August 5th?

16  A.  That phone call and her statement saying --

17  Q.  Admitting to the phone call?

18  A.  -- that if Ms. Jackson came to Alvin, what she

19  would do.

20  Q.  What did she say would happen if Congresswoman

21  Jackson came to Alvin?

22  A.  She said that we need to worry if Ms. Jackson Lee

23  came to Alvin, Texas.

24  Q.  When you came to arrest her or when you interviewed

25  her, did you see any firearms in the house?

1  A.   No, but I know her boyfriend has a firearm.

2  Q.   Which firearm is that?

3  A.   I believe it's a shotgun.  I don't know which one

4  it is, the make and model.

5  Q.   Just one?

6  A.   From what we were aware of, yes, just one.

7  Q.   You haven't seen it?

8  A.   No, I haven't seen it.

9  Q.   Okay.  Is there any -- was there any investigation

10 prior to her interview?

11 A.   Yes, it's a preliminary investigation.

12 Q.   Any surveillance conducted on her house?

13 A.   No, that's before the interviews, both of them, the

14 interviews and then the arrest.

15 Q.   Aside from the one shotgun that her boyfriend owns,

16 is there any reason to believe she has access to other

17 firearms?

18 A.   No, not that I'm aware.

19 Q.   Any part of the investigation indicate that she had

20 any plans to travel?

21 A.   No.

22 Q.   You don't have the audio recording with you today,

23 do you?

24 A.   It's on my laptop.  I don't have a device or

25 anything to play it.

1  Q.   You've heard it, of course?

2  A.   Yes.

3  Q.   Does she sound like she might be intoxicated while

4  she's making that phone call?

5  A.   During the phone call, it kinda seems like she is.

6  I can't really be sure.  I heard something that made me

7  think that she might be.  It's kind of over-saturated

8  mouth, it's kinda slurring a little bit, but --

9           THE COURT:  How long was the voicemail, the

10 call?

11          THE WITNESS:  It was a few minutes, three or

12 four minutes, I believe.

13          THE COURT:  So we're just getting the

14 snippets, but it's longer than what's in the proffer?

15          THE WITNESS:  Yes.

16          THE COURT:  One other question.  And is that

17 phone number for the Federal Judge, is that on the

18 website?  Is that publicly listed, or do you know?

19          THE WITNESS:  I'm not sure.

20          THE COURT:  Okay.

21 BY MR. AHMED:

22 Q.   Was the phone call to her chambers?

23 A.   Yes.

24 Q.   It wasn't a private cell phone?

25 A.   No.

1  Q.   Was there an interview of her boyfriend?

2  A.   Yes.

3  Q.   Anything relevant to the investigation from

4  speaking to him?

5  A.   So the interviews were split up by myself -- or FPS

6  and the U.S. Marshals.

7  Q.   Uh-huh.

8  A.   While we were speaking to her, somebody else was

9  talking to the boyfriend.  But other than that, he told

10 us she's -- from what I heard, he tries to talk to her,

11 calm her down.  He hasn't had any luck with that.

12 He told us about a time she put sugar in his gas tank.

13 He had to bail her out after that.  So he just pretty

14 much said he can't control her and he's tried to talk

15 to her, calm her down.  It's kinda hard to do.

16 Q.   Did you speak to her parents?

17 A.   No, other agents did.

18 Q.   Are you familiar with those interviews?

19 A.   For the most part, the father's.  I don't know too

20 much about the mom's.  I was more listening in on the

21 interview with the father.

22 Q.   Okay.  And he's present in the courtroom here?

23 A.   Yes.

24 Q.   Okay.  Anything relevant from that interview with

25 her father?

1  A.   I mean, pretty much says that she talks a lot.

2  She had a substance abuse about a year ago and she was

3  seeing somebody to get off of some drugs she was

4  taking.  Other than that, not so much more relevant.

5          MR. AHMED:  Pass the witness, Your Honor.

6          THE COURT:  Okay.  Anything else, Mr. Hanes?

7          MR. HANES:  Just brief.

8          THE COURT:  Sure, go ahead.

9                  **REDIRECT EXAMINATION**

10 **BY MR. HANES:**

11 Q.  When the defendant made the call to the Judge's

12 chambers and the whole voicemail gig, does she say "we"

13 a lot?

14 A.   Yes.

15 Q.  Like "We're going to do this" and "We're going to

16 do that"?

17 A.   Yes.

18 Q.  She does not say "I" or "me;" right?

19 A.   Correct.

20          MR. HANES:  That's it.

21          THE COURT:  Okay.  Thank you, sir.  You can

22 step down now.

23          Mr. Ahmed, what would you like to proffer?

24          MR. AHMED:  I would like to call her father as

25 a witness.

1           THE COURT:  Okay, you want to call him as a

2    witness.  Okay, go ahead.

3           MR. AHMED:  If I could just have a moment as

4    he's stepping up to finish reading the Pretrial Report?

5           THE COURT:  Sure.

6           MR. AHMED:  Thank you.  But I'd call Mark Shry.

7           COURT CLERK:  Do you solemnly swear that the

8    testimony you will give before the Court today will be

9    the truth, the whole truth, and nothing but the truth,

10   so help you God?

11          THE WITNESS:  I do.

12          *[Pause]*

13             **MARK SHRY, Called by the Defense**

14                  **DIRECT EXAMINATION**

15   **BY MR. AHMED:**

16   Q.  Good afternoon, Mr. Shry.  Can you please say your

17   name and spell it.

18   A.  Mark Shry, S-h-r-y.

19          THE COURT:  Sir, could you just move closer to

20   the microphone.  There you go.

21          THE WITNESS:  Mark Shry, S-h-r-y.

22   BY MR. AHMED:

23   Q.  And you spoke to a Pretrial Officer on the phone

24   earlier today?

25   A.  Yes.

1  Q.   And you informed the Pretrial Officer that you live

2  at *(Address redacted)*?

3  A.   Correct.

4  Q.   How long -- is that a house that you own?

5  A.   Yes.

6  Q.   How long  have you owned that house?

7  A.   I've been there since 1978.

8  Q.   Is that the home?

9  A.   What?

10 Q.   Is that the home that your daughter Abigail grew up

11 in?

12 A.   That address, I've had a trailer house there, I've

13 had another house, and then this one I built in 1994.

14 Q.   Okay.  How many bedrooms is the house that you live

15 in now?

16 A.   Three.

17 Q.   And who lives there?

18 A.   My grandson, my granddaughter, my wife and I.

19 Q.   Okay.  And your grandchildren, are those Abigail's

20 children?

21 A.   Correct.

22 Q.   Is that a 17-year-old son who's starting his senior

23 year in high school?

24 A.   High school, yes, 12th grade.

25 Q.   And her 19-year-old daughter, who's in college?

 1  A.   In college, second year.

 2  Q.   If the Court orders, would you allow your daughter

 3  to live with you?

 4  A.   Yes.

 5  Q.   And you have some firearms in the home?

 6  A.   I have an antique M1 that I can remove.

 7  Q.   Okay.  Do you work?

 8  A.   All the time, but I'm retired.

 9  Q.   What did you used to do?

10  A.   Oh, chemical industry.  I was an operator during

11  the eighties, R&B for AkzoNobel through the nineties

12  and up until 2002.  And then I started my trucking

13  company and I ended it on the 17th -- 2017.  2017.

14  Q.   '17, okay.  And do you live at the home in Alvin

15  with your wife?

16  A.   Yes.

17  Q.   That's Abigail's mother?

18  A.   Yes.

19  Q.   And is she retired as well?

20  A.   Yes.

21  Q.   And you and I talked about the duties of a

22  third-party custodian.

23  A.   Correct.

24  Q.   Are you willing to serve in that capacity?

25  A.   I will.

1  Q.  And you'd report any violations to her Pretrial

2  Officer if she's released?

3  A.  I will.

4  Q.  Can you tell the Judge just a little bit about your

5  daughter?  Where did she grow up?

6  A.  She grew up in Alvin, Texas, high school, 13th in

7  her class, graduating class.  It was either an accident

8  or an illness to where the doctor got her on

9  prescription drugs, opioids.  And then after that, it

10  was just the pill doctor epidemic in Houston and

11  around.  You know what happens.  You know, you've got

12  20 years of this stuff, you know.  And hopefully

13  they're starting to get it under control.  I don't know

14  if they will or not.

15  Q.  And so that started in about 2002 for Abigail?

16  A.  Probably.

17  Q.  About 20 years ago?

18  A.  Yeah.  I can't remember way back then.

19  Q.  Okay.  Tell the Judge a little bit more recently

20  about her substance abuse, attempts to get her

21  substance abuse under control.  Is she going to

22  treatment?

23  A.  She was going to treatment.  I believe she was

24  going to see the doctor.  She was on methadone, as you

25  reminded me, methadone.  She was getting off the

1  opioids.  And then the doctor put her on a medication

2  called Suboxone.  And anyhow, it worked.  She quit.

3  She doesn't want to do it anymore, but she does drink

4  beer.  So I just have to say that that's the only

5  problem she has now.

6  Q.  Do you have -- do you drink or does your wife drink

7  at home?

8  A.  We don't.  I've been sober, this is my 24th year.

9  January 20, 1999.

10 Q.  Please answer any questions from the Government.

11 A.  What?

12        THE COURT:  Go ahead, Mr. Hanes.

13                      **CROSS-EXAMINATION**

14 **BY MR. HANES:**

15 Q.  Sir, my name is Rick Hanes.  I'm with the

16 Prosecutor's Office.  You've got one ear that doesn't

17 work that well, don't you?

18 A.  Right.

19 Q.  No worries.  My dad had the same thing.  I'll just

20 use my talking to my dad voice.

21 A.  You know, the chemical plants will do a number on

22 you.

23 Q.  I imagine so.

24 `        Let me ask you, were you aware that your

25 daughter was arrested and found guilty of criminal

1  mischief in September of 2022?  Did you know that?

2  A.   I don't know --

3  Q.   Can you tell me whether or not you know what

4  happened, the facts?

5  A.   No.

6  Q.   Okay.

7  A.   I know she had trouble.

8  Q.   Okay.  And that actually -- also, there was an

9  assault and a resisting arrest from August of 2022, in

10 which she was sentenced to 30 days.  Do you know any of

11 the facts behind that?

12 A.   No, I think it's just the boyfriend stuff.  That's

13 all I remember.

14 Q.   Okay.  Now, did you know that this July she was

15 arrested for and has been charged with terroristic

16 threat, caused the fear of imminent serious bodily

17 injury?  Did you know about that?

18 A.   Yeah, well, that's why she's here.  But anyhow --

19 Q.   No, no, no, she's here for something else.  But

20 that's in Tarrant County in Austin, Texas --

21 A.   Oh, yeah.

22 Q.   -- that that case is pending from.  Do you know the

23 facts of that?

24 A.   Yeah, she's shooting her mouth off.  That's what it

25 is.  Whether -- I don't know who or what she mouthed

1 off to, but yeah, I know that.

2 Q.   Now, does she involve herself in politics or does

3 she gather around people who like to talk a lot about

4 politics while they drink beer?

5 A.   She gets all of her information from the Internet.

6 That's a fact.  She doesn't talk to anybody else, I

7 don't -- I just can't even imagine it, you know.  All

8 of her stuff is from the Internet.  You know, you can

9 get --

10 Q.   She was in Austin -- I'm sorry, go ahead, I

11 didn't --

12 A.   You can get anything you want to off the Internet.

13 Q.   You definitely can.

14 A.   And, you know, it will work you up.  So that's

15 exactly what it's doing to her.

16 Q.   Now, do you know whether or not in July of this

17 year, did she get worked up here?  By "here" I mean at

18 her home in Alvin, and then travel to Tarrant County to

19 Austin?

20 A.   No.

21 Q.   Or did she get worked up in Austin and then commit

22 the offense of terroristic threat?

23 A.   She hadn't gone anywhere.  She's never gone to

24 Austin, not to my knowledge.

25 Q.   So how did she end up getting a terroristic threat

1  charge against her in Tarrant County?

2  A.   I have no idea.  They arrested her in Alvin, I

3  think.  I don't understand all of that stuff, but yeah,

4  she shot her mouth off to somebody in Austin, and then

5  they came and arrested her at our home, I guess.

6  Q.   I'm not actually from Texas, I'm from Ohio, but my

7  impression of Texas is that a lot of people have guns;

8  is that right?

9  A.   Yeah, they do.

10 Q.   Yeah, they do.

11 A.   I think everybody.

12 Q.   I think that just about anybody could get a gun if

13 they needed one; is that correct?

14 A.   I'm sure they could.

15 Q.   Now, you're aware of the fact that your daughter

16 has been in the psychological hospital in the past for

17 treatment; is that correct?

18 A.   Correct.

19 Q.   And that was inpatient?

20 A.   Sir, I don't know.

21 Q.   Okay.  How often do you see your daughter before

22 all of this?

23 A.   My wife talks to her all the time and I am home.

24 I don't have a phone.

25 Q.   God bless you.

1   A.   Yeah, I'm thinking I'm not going to get one at all

2   again.  But anyhow, no, she comes over every now and

3   then.  We just butchered a calf and we get meat.  She

4   gets meat for her family and ours.  And anyway, there's

5   a good relationship, as far as I'm concerned.  She

6   comes over, I give her a hug, she gives me a kiss, you

7   know, stuff like that.  I'm her dad.

8   Q.   You're a good dad, too.  I appreciate you coming in

9   here.

10  A.   Well, I finally worked into it.

11  Q.   That's what we all do.

12  A.   Yeah.

13  Q.   I've got four children of my own, so I understand.

14  A.   Yeah, you've got a handful.

15          MR. HANES:  Pass the witness, Judge.

16          THE COURT:  Okay.  Anything else, Mr. Ahmed?

17          MR. AHMED:  Just a few things to follow up

18  with.

19          THE COURT:  Sure, go ahead.

20                   **REDIRECT EXAMINATION**

21  **BY MR. AHMED:**

22  Q.   Were you saying that the victim, the alleged victim

23  in the terroristic threat case, resides in Austin

24  County?  Is that what you think?

25  A.   I don't know.

1  Q.   But you don't have any information to believe that

2  your daughter drove to Austin or went to Austin and

3  committed a crime?

4  A.   She did not drive to Austin, no.

5  Q.   Just to clarify, when you say you don't have a

6  phone, you have and do use a cellular phone?

7  A.   I did have a phone at one time.  But yes, I've got

8  my wife's right now.

9  Q.   And you called me earlier today to help get to

10  court?

11  A.   She said, "Here's my phone, take it," you know.

12  "You need it."

13  Q.   You have a problem with your line right now, with

14  your cell phone?

15  A.   Well, you know, a lot of hacking going on and a lot

16  of viruses going around and I get on sites, you know,

17  trying to fix my cars and trucks and things.  And once

18  I get there, it says you've been hacked, a little bomb

19  blows up or whatever on the screen.  And so I just did

20  away with it.

21  Q.   Just one final --

22  A.   The same thing has happened to my computer at the

23  house, and so I just, I don't know, just felt pretty

24  good lately not having a phone.

25  Q.   I understand.  One final thing to follow up with.

1  You explained about how she as on Methadone and then

2  Suboxone.  That was on -- that was this year; is that

3  correct?

4  A.   Yes.

5  Q.   And when did she stop?

6  A.   I would have to ask her.  Seems like it was like

7  two months ago, three months ago, something like that.

8  I don't know.

9  Q.   And since then, alcohol has been the only issue?

10 A.   That's it.  Her and boyfriend will drink in the

11 afternoon.  That's about it.

12 Q.   Okay, thank you.

13           MR. AHMED:  I pass the witness, Your Honor.

14           THE COURT:  Okay.  Thank you, sir.  You can

15 step down.

16            Okay.  Mr. Ahmed, anything else?

17           MR. AHMED:  Just a brief proffer that I spoke

18 to her --

19           THE COURT:  Sure.

20           MR. AHMED:  -- boyfriend on the phone, and

21 that he confirmed that she could also live with her,

22 that that's no -- according to his understanding,

23 there's no court or protective order or any kind of

24 bond prohibition that would prevent that from

25 happening.  They were residing together at the time of

1  her arrest.

2          I asked him about the firearm.  As the

3  agent testified, it's a shotgun that belonged to his

4  father.  So it's like an heirloom that's in the house

5  and he also agreed that could be removed if the Court

6  was to allow her to return to live with him.

7          I think that's my only proffer.

8          THE COURT:  Okay, go ahead with -- well, who

9  wants to go first on the argument?  Well, why don't you

10 go first since it's your burden, Mr. Hanes.

11         MR. HANES:  Yes, sir.  Judge, I don't want to

12 be a footnote in a history book one day, and I think

13 that's what might just happen here.  We've got a

14 defendant who has a substance abuse problem who is

15 angry.  And whether or not there's an admission there,

16 all of her threats to the Judge, to Shelia Jackson Lee,

17 they were couched in terms of plural:  We.  Not me,

18 not I.  We.

19         This defendant obviously feels that she

20 is part of something.  She is calling up officials,

21 calling up Federal Judges, calling up Congresswomen,

22 telling them that she's going to kill them, telling

23 them that she's going to kill all of the LGBT and that

24 she's going to kill all the Democrats as well.  It

25 sounds a little bit bizarre, but then she goes back to

1  the whole point of focusing in on Sheila Jackson Lee.

2          Judge, in this particular case, this

3  particular defendant, these conditions recommended, I

4  think, are inadequate.  And I have to tell you that her

5  dad, he may be trying, and he made me feel old when he

6  said that the M1 was an antique.

7          But he doesn't know her.  You're going to

8  ask -- or you're going -- they're saying go ahead and

9  make him a third party custodian.  He doesn't know her.

10  He doesn't know if she went to Austin.  Somehow she

11  ends up with charges out of Austin for making

12  terroristic threats, and that's less than a month ago

13  that she made those threats and she got arrested for

14  that.  And now here she is, she didn't learn anything

15  from that, she's right back out there.

16          And if all she does -- if you put her on

17  bond, if all she does is get drunk and call people up

18  and threaten them and swear at them, we'll be lucky.

19  We'll be getting off easy.  This defendant has shown

20  absolutely no -- no predilection for following any kind

21  of court rule.  Because you know in Tarrant County,

22  when they said, "Okay, fine, we're going to put you on

23  bond, don't commit any other offenses," a month later --

24  less than a month later she's back dialing up random

25  politicians and judges and threatening their lives.

1    That's going to happen again.  She's going to get

2    drunk, she's going to do it again.

3            And I'm just telling you, the only way to

4    prevent that occurring is to place her in custody

5    pending the trial in this case, to deny her bond.  And

6    that's what I'm asking you to do.

7            THE COURT:  Thank you.

8            Mr. Ahmed.

9            MR. AHMED:  Your Honor, Ms. Shry has no prior

10   arrests for felonies.  All of her priors are

11   misdemeanors.  She has no prior bond violations.  She

12   has very strong ties to the community.  She has a very

13   safe place where she can reside with her father, her

14   mother, and her two adult children.

15           I represented a client who was charged

16   with -- in connection with the January 6th offense,

17   much more -- many of the people who were charged in

18   those types of crimes had much more active involvement,

19   including travel and, you know, statements that are

20   much more threatening, and many of them got bond.  I

21   actually had my case in front of Judge Chutkan and had

22   to go to D.C. and represent a client there in front of

23   her.

24           Here we have one phone call to a Judge

25   while she's intoxicated.  Not repeat phone calls.  One

1  phone call.  The Marshals in the Federal Protective
2  Service interviewed her several days later.  There
3  aren't repeat phone calls after that.  The Government
4  has no evidence that she traveled to Austin County for
5  the prior threat case that's just pending.  It's very
6  reasonable that if the victim is in a county, that the
7  person can be charged in the county where the victim
8  resides.  That could create venue for jurisdiction, so
9  the victim does not have to travel to where the person
10 making the threat resides.
11           So any argument that she is mobile or can
12 travel to make a threat is not established.  There's no
13 evidence that she has any kind of repeat access or
14 usage of firearms, that she goes to a range or that she
15 has a lot of ammunition or that she made any threat
16 involving firearms.  Threats here that are listed in
17 the Complaint are very generic, including to kill all
18 Democrats.  It's drunk talk, Judge.  And there's
19 conditions that the Court can impose.  In fact,
20 incarcerating her doesn't alleviate the threat.  As
21 the Court may know, sometimes people write threatening
22 letters to judges while they're incarcerated.
23           So, if she has substance abuse issues,
24 mental health issues, from stopping Suboxone or
25 Methadone for two or three months ago, that would

1  explain kind of where this spiral is.  And the best
2  thing that can happen for the safety of the community
3  and her ultimate rehabilitation is to impose strict
4  conditions of substance abuse and maybe even mental
5  health treatment, whether it's inpatient or outpatient.
6  But to incarcerate her over this first felony offense,
7  I think, would be excessive.
8          THE COURT:  So let me say this.  Mr. Shry,
9  thank you for coming.  Can you hear me?
10         MR. SHRY:  Yes.
11         THE COURT:  So I appreciate you coming.  You
12 know, everybody in this courtroom that's a dad, it's
13 extremely hard and I know it's not easy for you to
14 travel down here and deal with these issues.  And as
15 someone that's dealt with mental health issues -- and
16 not me personally, but with children and all these
17 issues -- there's nothing that breaks your heart more.
18 And so, you know, I've walked in your shoes and I feel
19 your pain, sir.
20         The hardest thing for me all week, and I
21 wondered, Ms. Shry, because we didn't have the Pretrial
22 Report of what I would be looking at.  And as Mr. Ahmed
23 said, I was hoping that I was going to be dealing with
24 a case of somebody that just made this one phone call
25 and it was an isolated situation.  But the thing that

1  we're all wondering is not whether she's going to write

2  a threatening letter or not whether she's going to make

3  another call, but is she going to act upon it.  I mean,

4  that's really -- you know, is it reasonable to believe

5  that she poses a danger and is she going to act upon

6  these things.

7          And so the thing that I've struggled with

8  since I read this Pretrial Report is it's not just --

9  it's not just a one call and it's not just random.  In

10 the call she's threatening the judges and she's

11 threatening a specific person.  The random people is a

12 certain community because that's not identifying people

13 within that community.  But when the agent does come to

14 her, you know, she backs off the statement about the

15 Judge, but she doesn't back off the statement about a

16 specific individual in this community.

17         But we're talking about somebody that, as

18 her dad pointed out, that, unfortunately through, you

19 know, bad doctors, got prescribed opioids and has had a

20 20-year battle with prescription drugs and also mental

21 health issues.  So mental health issues that have

22 gotten to the extreme where she was hospitalized.  So

23 we have somebody that has, you know, drug addiction,

24 mental health issue, hospitalization for those.

25         And then the past year thing have not

```
1   gotten better.  I mean, this would be her fourth
2   different entanglement with law enforcement in the past
3   year, and it just seems to me that it gets elevated
4   each time that we're dealing with.  And she's in a
5   situation, I know we've said it, but with her boyfriend
6   that's not a positive situation.  He's currently
7   charged with assaulting her.  So, I mean, we have --
8   in August 2022 we have an assault and resisting arrest
9   charge.  Then a month later we have the criminal
10  mischief.  And then just recently, less than a month
11  ago, we have the terroristic threat in Austin.  And
12  then this is the fourth offense.
13          And so that comes back to what do we --
14  what do we do?  You know, I mean, do we not listen to
15  what she's trying to tell us?
16          I know, Mr. Ahmed, that there's -- words
17  do have meaning.  I mean, she doesn't have a violent
18  past, but these things are elevated and we're taking
19  that combined with somebody that's mixing alcohol.  I
20  know her dad said that she stopped with -- she stopped
21  with -- I forget the name of it, it's slipping my mind,
22  that makes you not want to take other drugs, the
23  Suboxone.
24          But also, when they asked her, she wasn't
25  interested in receiving substance abuse or mental
```

1 health services. And so that's another troubling fact,
2 that you have a person that's doing these things that's
3 addicted, we know to alcohol, that's drinking in the
4 middle of the day and that, you know, as the agent
5 said, was probably drunk. The question is what about
6 with drugs. And then we're talking about someone that
7 keeps making these, that is it irrational to think
8 that she may not -- that she may act on these things,
9 especially, I mean, and these weren't just, you know,
10 kind of soft or had some -- these are pretty off the
11 wall things that she said.

12           And so it is hard for me, and I like to
13 follow what Pretrial does. And we're only talking
14 about an offense that carries the right maximum of up
15 to five years. And so I don't think I've ever had
16 someone detained -- I mean, she's not a flight risk and
17 she only faces up to -- she probably won't even score
18 out of it. I mean, you know, she's probably going to
19 score out of probation. I don't know. I haven't done
20 it, but probably that.

21           So we're talking about detaining someone,
22 but it's also, besides the safety of the community,
23 it's probably her own safety, too. I'm just caring for
24 her, too, that we're just talking about someone that's
25 not moving in the right direction. And anybody that

1   just looks at this and then not in a non-passionate or

2   dispassionate way would say, hey, her actions keep

3   going further, further, and further.

4           And it's not -- look, there's 300 million

5   people. There's only been a few people that actually

6   pick up the phone and call a Judge that's in the public

7   eye right now and threaten those things. And then when

8   the agents come, you know, don't really back off of

9   those things and talk about, you know, a Congresswoman

10   that's very visible in the community, that I just

11   don't -- you know, it's one of those I'll hear from --

12   it's not an easy decision for me, but I just -- I mean,

13   I'm leaning towards detaining her because I just think

14   that's safer for the community and for her own safety.

15   But I'll let you address some of the things I talked

16   about.

17           MR. AHMED: Just one fact that I can see would

18   be determinative for the Court is if she's unwilling to

19   engage in treatment. I honestly didn't focus or catch

20   that in the Pretrial Report, but I did discuss that

21   with her today. I think she was interviewed on Friday

22   and I don't know what mental state she was in when this

23   interview occurred. But when I spoke with her this

24   morning, I spoke to her at length about treatment and

25   whether it could be inpatient or outpatient, how the

1  Court could make it a condition that she has to take
2  medication that's prescribed, and whether she would be
3  willing to do that.  And she was willing to engage in
4  treatment, take all medication as of my conversation
5  with her this morning.
6         As far as argument, Your Honor, I also,
7  you know, understand the concern of the recent arrests
8  and the timing of them.  I think one thing she was
9  whispering to me is that it sounds like the August and
10 September incidents may have been combined.  It may
11 have been one related incident.
12        THE COURT:  Let me ask you this.  I think they
13 may have been combined as far as the adjudication, but
14 they look like separate instances and separate case
15 numbers.  So the Brazoria has Case No. 255065 and then
16 Case No. 255069.  So I think it was probably one final
17 hearing that she was sentenced on both.  But it looks
18 to me -- do you all know, Mr. Hanes?  Is it two
19 separate incidents?
20        MR. HANES:  It is two separate incidents with
21 two separate case numbers.
22        MR. AHMED:  I think it may have been an arrest
23 for the underlying.
24        THE COURT:  Okay.
25        MR. AHMED:  That this occurred during the --

1  but the issue, Judge, with her mental health and with

2  her substance abuse is that her incarceration pending

3  trial, however long this takes, is not going -- her

4  situation is not going to improve.  When someone has

5  substance abuse problems, jail doesn't do much for

6  them.  It does keep them clean chemically, but it

7  doesn't give them the tools to overcome that addiction.

8  And if it's a mental health problem, it could get worse

9  while a person is incarcerated.

10              There are very strict conditions that the

11 Court can impose, including home detention.  That would

12 ensure that she doesn't leave, including a GPS monitor.

13 Include a condition of no alcohol, and that seems like

14 it's very reasonable that it's going to be complied

15 with.  If she's living in a home with her father, who's

16 been sober for 24 years, and her mother, they don't

17 drink in the house.  And she's on an ankle monitor

18 living with her parents and her two adult children in

19 Alvin.  She's away from the individuals that were

20 threatened allegedly.

21              And with regard to her statement upon her

22 arrest, I mean, it sounds like someone just doesn't know

23 how to stop talking.  It's not someone who's saying,

24 "I'm going to go commit this specific attack." I didn't

25 hear the interview with the agents, but I would agree

1  it sounds like she's not backing off, and that saying,

2  you know, if she comes to Alvin, if Congresswoman comes

3  to Alvin, then there could be a problem.  But she

4  didn't repeat and say that she would be killed or

5  anything more specific along those lines.

6              But there certainly are conditions that

7  can ensure the safety of the community, and I think it

8  would be --

9          THE COURT:  So I'll make a response before I

10  let Mr. Hanes.  So the one thing is I don't think she's

11  going to stop drinking on her own.  If I released her,

12  I don't think -- that's just not going to happen right

13  now, that she's going to just suddenly go absent of

14  alcohol.  I think that -- you know, I'll hear from

15  Mr. Hanes and I agree with what you're saying, but I

16  think to me the better course is that she remain

17  detained for a month, we come back in a month, and then

18  we discuss what the potential place that she could go

19  to, a facility that she would get both mental health

20  and substance abuse treatment.

21              I know she's been through it, but that's

22  what I think.  As I sit here today, the most rational

23  thing is, in that way when we know that she gets there,

24  that she's at least had a month of sobriety before --

25  because those places aren't locked facilities.  And so

1  I think at least we know that when we're putting her

2  there, that there's nothing in her system, and the

3  chances of her doing -- because there's no doubt that

4  these things are probably all being fueled by alcohol

5  and other things.  So that's my fear is that when she's

6  not thinking clearly, that she's going to get in one of

7  these ranges because the things just keep escalating,

8  and she's going to do something, something that we'd

9  all regret.

10          But let me hear from Mr. Hanes.

11          MR. HANES:  Judge, my greatest concern in this

12  case is that she starts watching FOX News again, gets

13  herself spun up, she goes out, she gets a case of beer,

14  continues to get herself spun up.  There's no way to

15  gauge what's going to happen here, except to look at

16  what she's done in the past six months.  I mean, not

17  even a year, the past six months.

18          You are right, it is escalating.  We are

19  now here for a felony.  I know it's a five-year cap on

20  this felony.  And I've never asked for detention for

21  someone who had a five-year cap.  In fact, I can't

22  think of another case or another charge that has a

23  five-year cap.  I don't see that.

24          But in this particular instance, again, I

25  just go back and don't want to be that FBI Agent that

1   didn't go check on Lee Harvey Oswald two days before

2   John Kennedy was assassinated.  That happened.  And

3   that's the footnote in history.  And I'm standing here

4   before you today because this defendant is unmoored and

5   I believe that there's going to be more.

6            And as I said before, if all we get is

7   threats on a telephone call, we'll be doing okay.  But

8   she can talk to other people, she can build other

9   people up.  If we're going to speculate that she will

10  all of the sudden -- you know, she'll come out a month

11  from now and she'll be clean and sober and she'll be

12  ready to stop any sort of intoxicant, ingesting any

13  intoxicants at all, that's great.

14           But let's look at what her prior history

15  tells us she's going to do, because it sure as heck

16  doesn't tell us that she's  going to come out clean and

17  sober with a great attitude.  It tells us that she's

18  going to come out, she's going to get drunk, she's going

19  to get angry, she's going to start this whole cycle over

20  again.  And just like the Judge in Austin who doesn't

21  even know we're here right now, but you're going to be

22  like that guy.  Because there's a third charge out

23  there and a fourth and a fifth.

24           There has been no indication whatsoever

25  that this defendant is going to stop.  And you know

1  that that first Judge in Austin had this same

2  conversation with her and released her to go home, to

3  behave herself.  She did not do that, Judge.  And I'm

4  just asking you to protect society from this woman

5  until she gets it under control.  And I don't believe

6  that a month is going to make any difference, but

7  that's your job.

8           THE COURT:  So this is my thought is that

9  regardless of this whole case, she's going to be

10  released and she's going to be released in the near

11  future regardless of what happens in this -- regardless

12  of what I do today and regardless of this case.  But

13  the real underlying issue, whatever we do in this case

14  is she's got mental health issues and she's got

15  substance abuse issues.  And unless those are addressed,

16  things are going to happen in the future in her life

17  and we're going to be back here.

18              And so to me, my thought is that she

19  remain detained for a month.  I might release her in a

20  month.  I'd like to come back and see what her attitude

21  is towards an inpatient drug treatment place.  And then

22  I'm not saying we can do it all here, what you have to

23  say about it, Mr. Hanes.  And then she goes to a

24  facility for 60 days and gets mental health and

25  substance abuse treatment.  And then when she finishes

that, assuming that the underlying felony hasn't been
resolved, then we discuss whether she goes back into
custody or she's released on a bond.

          But at that point, at least we have three
months -- what I assume hopefully three months of
sobriety and at least another stint in a facility.
But I think to me they are baby steps and it's, as
Mr. Hanes said I'm cognizant it's protecting society
and it's also trying to help her at the same time.

          So that's my order is that she'll be
remanded.  We'll set a date for 30 days to come back
here.  I'll issue an order.  In 30 days before that
hearing, I'll have Pretrial look into -- none of them
are lockdown facilities, but the best local facility
that's the most secure.  Normally at those facilities
they don't like you having an ankle monitory, but if
I'm going to go that route, she's going to have an
ankle monitor be on, and then we can discuss her being
at one of those facilities for 60 days.  And at least I
think it's the most, you know, humane thing of trying
to protect society while at the same time trying to
help her.

          Mr. Ahmed, any questions from you?

          MR. AHMED:  No, Your Honor.

          THE COURT:  Mr. Hanes?

1         MR. HANES:  No, Judge.

2         THE COURT:  Okay.  Good luck, sir.  Thank you

3 for coming again.

4      *[2:45 p.m. - Proceedings adjourned]*

5

6           C E R T I F I C A T I O N

7

8    I certify that the foregoing is a correct

9 transcript of the electronic sound recording of the

10 proceedings in the above-entitled matter.

11

12

13 /s/ Gwen Reed

14 4-30-24

15

16

17

18

19

20

21

22

23

24

25